UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DEBORAH OSINOFF,

                              Plaintiff,

        v.

NUVANCE HEALTH *d/b/a* SHARON
HOSPITAL, *and* TAMMY CORDOVANO

                              Defendants.

---

No. 22-CV-2017 (KMK)

OPINION & ORDER

Appearances:

Megan Sarah Goddard, Esq.
Goddard Law PLLC
New York, NY
*Counsel for Plaintiff*

Colby Berman, Esq.
Akerman LLP
New York, NY
*Counsel for Defendants*

Adam Edward Collyer, Esq.
Lewis Brisbois Bisgaard & Smith LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Deborah Osinoff brings this Action against Nuvance Health ("Nuvance") and

Tammy Cordovano ("Cordovano"; collectively, "Defendants"), alleging age discrimination and

hostile work environment claims under the Age Discrimination in Employment Act ("ADEA"),

the New York Human Rights Law ("NYSHRL"), and the Connecticut Fair Employment

Practices Act ("CFEPA").  (*See generally* Compl. (Dkt. No. 1-1).)  Before the Court is

Defendants' Motion for Summary Judgment.  (*See* Not. of Mot. (Dkt. No. 61).)  For the foregoing reasons, Defendants' Motion is granted.

## I.  Background

### A.  Factual Background

The following facts, recounted in the light most favorable to Plaintiff, are taken from Defendants' Rule 56.1 statement, Plaintiff's response and counterstatement, and the exhibits submitted by the Parties.  These facts are not in dispute unless otherwise indicated.[1]

Defendant Nuvance is a not-for-profit corporate hospital system with facilities throughout New York and western Connecticut.  (Defs' Rule 56.1 Statement ("Defs' 56.1") ¶ 1 (Dkt. No. 64); Pl's Counterstatement ("Pl's Resp. 56.1") ¶ 1 (Dkt. No. 72).)  Within that portfolio, Nuvance operates Sharon Hospital, a facility that contains a Senior Behavioral Health Unit ("SBH Unit").  (Defs' 56.1 ¶ 5; Pl's Resp. 56.1 ¶ 5.)  The patient population of the SBH Unit consists of individuals aged 55 and older, most of whom suffer from dementia and other psychiatric issues.  (Defs' 56.1 ¶¶ 29–31; Pl's Resp. 56.1 ¶¶ 29–31.)  Because of those conditions, SBH Unit patients are often confused and are at higher risk for falling; and staff, in

---

[1] Plaintiff's 56.1 Response contains numerous objections and disputes.  While many of those objections raise legitimate factual questions, many of them are sematic disagreements, recitations of irrelevant facts, or improperly interject conclusory arguments.  (*See, e.g.*, Pl's Resp. 56.1 ¶¶ 24, 35, 36, 66 ("Cordovano's testimony, cited by Defendants here, is self-serving and a jury can conclude that it is 100% untrue[.]"), 67 ("A jury can conclude that Cordovano[] . . . wanted to assign [Plaintiff] to Reed who she knew was a wholly unsympathetic, impatient, and unhelpful trainer[.]").)  These paragraphs do not "specifically controvert" material in Defendants' 56.1 statement, so the Court does not consider them.  *See Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [d]efendants, often speaking past [d]efendants' asserted facts without specifically controverting those same facts."); *see also W.S.R. by & through Richardson v. FCA US, LLC*, No. 18-CV-6961, 2022 WL 4648403, at *18 n.25 (S.D.N.Y. Sept. 30, 2022) (disregarding "semantic and legal argument[s]" raised in response to a Rule 56.1 statement).

turn, must monitor them closely.  They have a little room for error in providing care.  (Defs' 56.1 ¶¶ 33–35; Pl's Resp. 56.1 ¶¶ 33–35.)

### 1.  Plaintiff's Hiring & Training

In June 2020, Nuvance's Talent Acquisition Representative emailed Defendant Tammy Cordovano ("Cordovano")—the SBH Unit's program manager (Defs' 56.1 ¶ 42; Pl's Resp. 56.1 ¶ 42)[2]—about two candidates, including Plaintiff, who applied for social worker positions. (Defs' 56.1 ¶ 2; Pl's Resp. 56.1 ¶ 2.)  Plaintiff's resume reflected that she had more than 20 years of clinical experience with mentally ill patients.  (Defs' 56.1 ¶ 3; Pl's Resp. 56.1 ¶ 3.)  After reviewing Plaintiff's resume, Cordovano interviewed Plaintiff via phone.  And on July 31, 2020, Nuvance offered Plaintiff a social worker position in the SBH Unit subject to a 90-day probationary period.  (Defs' 56.1 ¶¶ 4–5; Pl's Resp. 56.1 ¶¶ 4–5.)[3]

Plaintiff and another newly hired social worker, Emily Zurzola ("Zurzola"), began work in the SBH Unit on August 4, 2020.  (Defs' 56.1 ¶ 8; Pl's Resp. 56.1 ¶ 8.)  Both Plaintiff and Zurzola reported directly to Cordovano.  (Defs' 56.1 ¶ 9; Pl's Resp. 56.1 ¶ 9.)  At that time, the SBH Unit was made up of four Social Workers, including Plaintiff, Zurzola, Kelly Reed ("Reed"), and Haley Coletti ("Coletti").  (Defs' 56.1 ¶ 39; Pl's Resp. 56.1 ¶ 39.)  On the medical

---

[2] In some instances, like this one, the Parties have each submitted exhibits with excerpts from the same deposition transcript.  (*See* Decl. of Megan S. Goddard in Opp., to Mot. ("Goddard Decl.") (Dkt. No. 74), Ex. 1 ("Cordovano Dep."); Decl. of Adam E. Collyer ("Collyer Decl.") (Dkt. No. 65), Ex. C (Dkt. No. 64-1).)  Because citing to the exhibits themselves may be confusing or duplicative, the Court cites to the page(s) on the deposition transcripts themselves.

[3] A "probationary period" in this context refers to a trial period after which Nuvance could determine "whether to continue the employment relationship based on the employee's job performance, dependability[,] and attitude."  (*See* Collyer Decl., Ex. E ("Probationary Policy"); *see also id*., Ex. K ("Koppe Dep."), at 33–34; Cordovano Dep. at 130.)  Plaintiff disputes what was required under Nuvance's policies to dismiss an employee during the probationary period. (Pl's Resp. 56.1 ¶ 24.)

side of the house, Dr. Sabooh Mubbashar ("Dr. Mubbashar") served as the Unit's director. (Defs' 56.1 ¶ 38; Pl's Resp. 56.1 ¶ 38.)

Social workers had a variety of responsibilities including performing psychosocial assessments within 72 hours of admission; running family meetings; and attending morning rounds where Dr. Mubbashar, nursing staff, and discharge planners would present pertinent information about patients to Dr. Mubbashar upon request.  (Defs' 56.1 ¶¶ 57–59; Pl's Resp. 56.1 ¶¶ 57–59.)

As new employees, both Plaintiff and Zurzola received training which largely consisted of shadowing and sitting with current social workers.  (Defs' 56.1 ¶¶ 65, 70–72; Pl's Resp. 56.1 ¶¶ 65, 70–72.)  Zurzola was assigned to train with Coletti, while Plaintiff was assigned to train with Reed.  (Defs' 56.1 ¶¶ 70–71; Pl's Resp. 56.1 ¶¶ 70–71.)  This initial assignment choice is the subject of some contention.  Plaintiff recalls Cordovano stating, during Plaintiff's interview, that she would train with Coletti.  (Decl. of Deborah Osinoff ("Osinoff Decl.") ¶ 15 (Dkt. No. 73).)  But Plaintiff states that Cordovano reversed course after Plaintiff started working.  (*Id.*)  Defendants maintain that Cordovano made assignment choices before Plaintiff's August start date.  (Def's 56. ¶ 67.)  Regardless, Plaintiff was initially excited to train with Reed, who had more work experience than her colleagues.[4]  (Defs' 56.1 ¶¶ 40, 72; Pl's Resp. 56.1 ¶¶ 40, 72.)

Plaintiff's experience in training is also disputed.  According to Defendants, Reed trained Plaintiff thoroughly, provided training materials, allowed Plaintiff to observe Reed carrying out various responsibilities, all the while narrating each step of the process.  (Defs' 56.1 74–77.)  Plaintiff points to testimony from Zurzola that Reed was often frustrated with Plaintiff, (Goddard

---

[4] Plaintiff does not dispute that Reed "had been employed at Sharon Hospital longer than any of her colleagues" but disputes whether she was "experienced" in the qualitative sense.  (Pl's Resp. 56.1 ¶ 40.)  The Court uses "work experience" only in the former sense.

4

Decl., Ex. 9 ("Zurzola Dep.") at 82–83), and testimony from Reed indicating there was not a binder of templates to help get Plaintiff up to speed on paperwork. (*Id*., Ex. 4 ("Reed Dep.") at 187.)[5]  Plaintiff also testified that Reed did not sit beside her to demonstrate tasks, that Reed explained processes in a fragmented way, and that she did not provide cohesive, step-by-step analysis. (Osinoff Dep. at 117–18.)  By contrast, Zurzola testified that her trainer, Coletti, was verbally engaged, would allow Zurzola to review draft emails, and would allow Zurzola to listen in on family calls. (Zurzola Dep. at 49–51.)[6]

### 2.  Plaintiff's Interactions with Cordovano

Plaintiff's interactions with Defendant Cordovano are a core part of this case.  As a general matter, Cordovano has been given feedback that she can have an unintentional edge to her tone when interacting with colleagues. (Defs' 56.1 ¶ 53; Pl's Resp. 56.1 ¶ 53.)  And according to Plaintiff, there was an element of fear among people with whom Cordovano worked. (Defs' 56.1 ¶ 54; Pl's Resp. 56.1 ¶ 54.)  Speaking to Cordovano's edge, Zurzola testified that Cordovano yelled nearly every day, although less harshly than Dr. Mubbashar, who also yelled quite often. (*See* Zurzola Dep. at 132, 172, 205.)

---

[5] According to Defendants, Reed became frustrated when Plaintiff did not respond to the various training approaches that Reed applied to improve Plaintiff's learning. (Defs' 56.1 ¶ 92.)

[6] Plaintiff raises a purported dispute about when she and Zurzola each received access to a computer. (Pl's Resp. 56.1 ¶ 98.)  Viewing the disputed facts in her favor, Plaintiff received access to her own computer after one-and-a-half weeks of work. (*See* Osinoff Dep. at 113, 124.) The record also reflects that Zurzola did not have her own computer the first week but occasionally used one to check her email and shared Coletti's computer during training, perhaps using it to practice tasks. (Zurzola Dep. 74–77.)  Also undisputed is that Plaintiff sat at either Reed or Cordovano's computer. (Reed Dep. at 129; Collyer Decl., Ex. O ("Balducci Dep") at 23; *see also* Def's 56.1 ¶ 77.)  On this basis, Plaintiff states in paragraph 98 of her 56.1 Response that "[a] jury can conclude, as Plaintiff did, that Cordovano prevented her from having access to the tools she needed for training because Cordovano was appalled at Plaintiff's age when she first met her in person."  However, to extent there is a dispute about the difference in computer access between Plaintiff and Zurzola, this conclusion is inappropriate to include in a Rule 56.1 statement. *See Baity*, 51 F. Supp. 3d at 418.

Especially relevant here is one interaction Plaintiff recalls from September 2020 that is described in full in the Complaint:

> On or about the second week of September, Supervisor Cordovano entered the office shared by Nurse Manager Lisa, the Co-Trainee, and Plaintiff. Supervisor Cordovano sat on a chair in the middle of the room.  At this point, Nurse Manager Lisa, the Co-Trainee, and Plaintiff stopped working because they believed Supervisor Cordovano had an important work announcement. Instead, Supervisor Cordovano started a conversation about her exercise and work-out routine and ended her comments by saying her exercise level was "not bad for someone who's my age." She then announced her age and immediately and expectantly looked at Nurse Manager Lisa, who nervously laughed and then stated her age. Next, Supervisor Cordovano looked expectantly at the Co-Trainee, and it was clear that she was also expected to reveal her age, which she did, by stating that she was 23 years old.  Finally, Supervisor Cordovano looked expectantly at Plaintiff, who felt trapped and pressured to give her age and finally announced, humiliated, that she was 61 years old.  Supervisor Cordovano abruptly stood up, put the chair away, and left the room.

(Compl. ¶ 42; Osinoff Dep. at 148–52 (testifying to same events).)  As discussed in detail herein, this incident forms the basis of Plaintiff's claims.

### 3.  Plaintiff's Work Performance

As Plaintiff related to Coletti, another social worker, Plaintiff had a difficult time adjusting to the job.  (Defs' 56.1 ¶ 131; Pl's Resp. 56.1 ¶ 131.)  The full extent of those difficulties is also the subject of dispute.  But the Parties agree on some things: Plaintiff had a difficult time during morning rounds, where she sometimes was unable to answer questions and performed worse than other social workers, (Defs' 56.1 ¶ 122; Pl's Resp. 56.1 ¶ 122); she would ask the same question multiple times, (Defs' 56.1 ¶ 108; Pl's Resp. 56.1 ¶ 108), and she misplaced important forms, (Defs' 56.1 ¶ 109; Pl's Resp. 56.1 ¶ 109).

Additionally, Zurzola, Cordovano, Reed, and Balducci all registered concerns about Plaintiff's performance.  (Defs' 56.1 ¶¶ 124–30; Pl's Resp. 56.1 ¶¶ 124–30.)  For instance, Reed testified that Plaintiff at one point "had several notebooks going," (Reed Dep. 175), could not always readily find information she noted, (*id*. at 175), and had difficulty printing, (*id*. at 155);

Balducci testified that Plaintiff was having a hard time with the job, (Balducci Dep. 27); and Zurzola raised concerns about difficulty keeping up with her (Zurzola's) own workload because she had to provide oversight of everything Plaintiff did, (Defs' 56.1 ¶ 128; Pl's Resp. 56.1 ¶ 128.).

The Parties discuss numerous other aspects of Plaintiff's performance, which the Court addresses as needed in the body of this Opinion.  These concerns are detailed at length in documents Cordovano and Reed submitted to Nuvance's human resources department, although that documentation, specifically, was never shared with Plaintiff.  (Pl's Counter 56.1 ¶ 191; Collyer Decl., Exs. V, X.)

### 4. Plaintiff's Termination

Nuvance has a progressive disciplinary policy.  (Defs' 56.1 ¶ 22; Pl's Resp. 56.1 ¶ 22; *see* Collyer Decl., Ex. L.)[7]  As explained by Kelly Koppe ("Koppe")—one of Sharon Hospital's HR Business Partners—the policy proceeds in four stages: written caution, written warning, final written warning, and termination.  (Defs' 56.1 ¶ 23; Pl's Resp. 56.1 ¶ 23.)  There are instances, however, where employees could receive one written warning, and then be terminated, including employees who are within their probationary period and employees who do something egregious or illegal.  (Defs' 56.1 ¶ 24; Pl's Resp. 56.1 ¶ 24.)

On August 20, 2020, Cordovano emailed Koppe asking to have a conversation about Plaintiff's performance.  (Defs' 56.1 ¶ 134; Pl's Resp. 56.1 ¶ 134.)  Koppe responded asking for documentation concerning Plaintiff's performance deficiencies, which Cordovano provided on September 8.  (Defs' 56.1 ¶¶ 135–36; Pl's Resp. 56.1 ¶¶ 135–36; *see also* Collyer Decl., Ex. W).

---

[7] Plaintiff disputes the extent to which Cordovano and other witnesses are aware of the contents of that policy.  (Pl's Resp. 56.1 ¶ 22.)

Cordovano then emailed Koppe a draft disciplinary writeup which Koppe approved as a written caution, the first step in the disciplinary policy.  (Defs' 56.1 ¶¶ 138; Pl's Resp. 56.1 ¶¶ 138.)

On September 9, 2020, Cordovano called Plaintiff into her office and issued her a written warning regarding her performance shortcomings.  Among other things the warning stated that "an immediate and sustained improvement in job functions and responsibilities [was] necessary." (Defs' 56.1 ¶¶ 140–42; Pl's Resp. 56.1 ¶¶ 140–42; *see also* Collyer Decl., Ex. Z.)  Plaintiff disagreed with the warning but stated that she had a lot to learn.  (Defs' 56.1 ¶¶ 143–44; Pl's Resp. 56.1 ¶¶ 143–44.)  Reports of Plaintiff's poor performance persisted afterward although, in a few instances, Dr. Mubbashar and Cordovano complimented Plaintiff's work.  (Defs' 56.1 ¶¶ 150–51; Pl's Resp. 56.1 ¶¶ 150–51.)

On September 30, Cordovano emailed Koppe again regarding Plaintiff's performance issues, and Koppe responded advising that Cordovano could move forward with Plaintiff's termination.  (Defs' 56.1 ¶¶ 153–54; Pl's Resp. 56.1 ¶¶ 153–54.)  Cordovano and Balducci then met with Plaintiff and told Plaintiff that she was terminated.  (Defs' 56.1 ¶¶ 161–63; Pl's Resp. 56.1 ¶¶ 161–63.)[8]  For the purposes of this Motion, the Parties do not dispute that Plaintiff's position was not filled after her termination.  (Defs' 56.1 ¶ 165; Pl's Resp. 56.1 ¶ 165.)

B.  Procedural History

Plaintiff filed her Complaint in New York State Supreme Court on February 23, 2022, after which Defendants successfully removed.  (Not. of Removal (Dkt. No. 1); Compl. (Dkt.

---

[8] The Parties dispute what Cordovano and Balducci said at this meeting regarding the reason(s) for Plaintiff's termination.  (Defs' 56.1 ¶ 163; Pl's Resp. 56.1 ¶ 163.)  Plaintiff claims that Cordovano only referenced a HIPAA violation in the meeting, (Pl's Resp. 56.1 ¶ 163), while Defendants state she was terminated for "performance issues," (Defs' 56.1 ¶ 163).  Plaintiff does not dispute, however, that her termination notice references her "ability to perform the job functions and responsibilities of a Social Worker" and her previous written caution.  (Collyer Decl., Ex. BB.)

No. 1-1).)  After an extension, (Dkt. No. 8), Defendants filed their Answer on April 7, 2022, (Dkt. No. 9).  Before the close of discovery, Defendants filed a pre-motion letter in anticipation of moving for summary judgment, (Dkt. No. 35), to which Plaintiff responded, (Dkt. No. 37).  Defendants renewed that request on January 25, 2023, after the close of discovery, (Dkt. No. 50).

On February 22, 2023, the Court held a pre-motion conference and adopted a briefing schedule.  (Order (Dkt. No. 56).)  After two extensions, (Dkt. Nos. 58, 60), Defendants filed the instant Motion, (Not of Mot.; Decl. of Tammy Cordovano in Supp. of Mot. ("Cordovano Decl.") (Dkt. No. 63); Defs' 56.1; Collyer Decl.; Mem of Law in Supp. of Mot. ("Defs' Mem.") (Dkt. No. 66).)  Plaintiff responded on July 14, 2023.  (Mem. of Law in Opp. to Mot. ("Pl's Mem.") (Dkt. No. 71); Osinoff Decl.; Goddard Decl..)  And on August 11, 2023, after another extension, (Dkt. No. 76), Defendants filed their Reply.  (Reply Mem. of Law ("Def's Reply") (Dkt. No. 77); Decl. of Adam E. Collyer in Supp. of Mot. ("Reply Decl.") (Dkt. No. 78).)

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same) (quoting Fed. R. Civ. P. 56(a)).  "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Torcivia v. Suffolk Cnty., New York*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists."  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive*

*Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the non[-]moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted) (internal quotation marks and citation omitted); *see also U.S. Bank Nat'l Ass'n as Tr. for Reg. Holders of J.P. Morgan Chase Com. Mortg. Sec. Corp., Multifamily Mortg. Pass-Through Certificates, Series 2017-SB42 v. 160 Palisades Realty Partners LLC*, No. 20-CV-8089, 2022 WL 743928, at *3 (S.D.N.Y. Mar. 10, 2022) (same). Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that h[er] allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)); *see also Jennifer Fung-Schwartz, D.P.M, LLC v. Cerner Corp.*, No. 17-CV-233, 2023 WL 6646385, at *3 (S.D.N.Y. Oct. 12, 2023), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks and citation omitted); *see also Kollias v. Univ. of Rochester*, No. 18-CV-6566, 2023 WL 5608868, at *4 (W.D.N.Y. Aug. 30, 2023) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading." (quoting *Wright v. Goord*, 554 F.3d 255, 266

(2d Cir. 2009))).  Indeed, "[w]hile summary judgment must be granted with caution in employment discrimination actions, . . . a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 302 (S.D.N.Y. 2009) (internal quotation marks and citation omitted); *see also Streichert v. Town of Chester*, No. 19-CV-7133, 2022 WL 4449305, at *4 (S.D.N.Y. Sept. 23, 2022) ("It is the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact, and may be appropriate even in the fact-intensive context of discrimination cases." (alteration omitted) (quoting *Schiano v. Quality Payroll Sys., Inc*., 445 F.3d 597, 608 (2d Cir. 2006))).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Seward v. Antonini*, No. 20-CV-9251, 2023 WL 6387180, at *12 (S.D.N.Y. Sept. 29, 2023) (quoting *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014)).  "At this stage, 'the role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *U.S. Sec. & Exch. Comm'n v. Amah*, No. 21-CV-6694, 2023 WL 6386956, at *8 (S.D.N.Y. Sept. 28, 2023) (alteration adopted) (quoting *Brod v. Omya*, 653 F.3d 156, 164 (2d Cir. 2011)).  Therefore, "a court's goal should be 'to isolate and dispose of factually unsupported claims.'" *Id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

When ruling on a motion for summary judgment, a district court should "consider only evidence that would be admissible at trial." *Latimer v. Annucci*, No. 21-CV-1275, 2023 WL 6795495, at *3 (S.D.N.Y. Oct. 13, 2023) (citing *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.,* 164 F.3d 736, 746 (2d Cir. 1998)).  "Where a party relies on affidavits . . . to establish facts,

the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *Mozzochi v. Town of Glastonbury*, No. 21-CV-1159, 2023 WL 3303947, at *3 (D. Conn. May 8, 2023) (quoting Fed. R. Civ. P.56(c)(4)); *see also DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (same); *E. Fishkill Fire Dist. v. Ferrara Fire Apparatus, Inc.*, No. 20-CV-576, 2023 WL 6386821, at *11 (S.D.N.Y. Sept. 28, 2023) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ." (internal citation omitted)); *Baity*, 51 F. Supp. 3d at 419 (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (internal quotation marks and citation omitted)).

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Martinez v. Pao's Cleaning, Inc.*, No. 16-CV-6939, 2018 WL 6303829, at *2 (E.D.N.Y. Dec. 3, 2018) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005)).  However, although witness credibility is usually a question of fact for the jury, *Yu Zhang v. Sabrina USA Inc.*, No. 18-CV-12332, 2021 WL 1198932, at *3 (S.D.N.Y. Mar. 30, 2021), "[b]road, conclusory attacks on the credibility of a witness without more [are] insufficient to raise a genuine issue of material fact that would defeat a motion for summary judgment, *Sec. & Exch. Comm'n v. Airborne Wireless Network*, No. 21-CV-1772, 2023 WL 5938527, at *6 (S.D.N.Y. Sept. 12, 2023) (internal quotation marks and citation omitted); *see also Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 128 (E.D.N.Y. 2009) ("If the moving party has made a properly supported motion for summary judgment, the plaintiff may not respond simply with general attacks upon the defendant's credibility." (alterations

omitted) (internal quotation marks and citation omitted)).  As such, "when opposing a motion for

summary judgment, the non-moving party may not respond simply with general attacks upon the

declarant's credibility, but rather must identify affirmative evidence from which a jury could find

that the non-moving party has carried its burden of proof."  *Moritz v. Town of Warwick*, No. 15-

CV-5424, 2017 WL 4785462, at *8 (S.D.N.Y. Oct. 19, 2017) (alterations adopted) (internal

quotation marks and citation omitted); *see also Paul v. Postgraduate Ctr. for Mental Health*, 97

F. Supp. 3d 141, 181 (E.D.N.Y. 2015) ("'Although credibility assessments are improper on a

motion for summary judgment,' a court may be justified in dismissing a claim when the

'plaintiff's version of the events is in such discord with the record evidence as to be wholly

fanciful.'" (quoting *Pulliam v. Lilly*, No. 07-CV-1243, 2010 WL 935383, at *5 (E.D.N.Y.

Mar. 11, 2010))).

> B.  Analysis

Plaintiff brings two categories of claims, each under three different statutes.  Specifically,

she raises age discrimination and hostile work environment claims under the ADEA, CFEPA,

and NYSHRL.  (*See generally* Pl's Mem.; Compl.)  Defendants argue that summary judgment is

appropriate as to all claims.[9]

Before diving in, it is helpful to clarify Plaintiff's theory of this case.  In her view,

Defendants' discrimination (and hostility) started "immediately upon [her] arrival" when they

were "horrified to see that [Plaintiff] was not the 40-year-old [they were] expecting, but a 60-

year-old."  (Osinoff Decl. ¶ 14.)  Soon afterward, Plaintiff asserts, Defendants decided they had

---

[9] The Court notes that not all of these statutes provide for personal liability.  *See Malcolm v. Rochester City Sch. Dist.*, 388 F. Supp. 3d 257, 263 (W.D.N.Y. 2019) (citing *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009)) ("The ADEA . . . do[es] not provide for personal liability against individuals.").  Because the Court grants summary judgment to Defendants on all claims, it does not examine (and the Parties do not discuss) which claims are applicable to Defendant Cordovano.

13

no interest in training Plaintiff, or actually reviewing her performance, and "fabricat[ed]" evidence of her poor performance to "lay[] a paper trail for a discriminatory termination." (Pl's Resp. 56.1 ¶ 121; Pl's Counter 56.1 180.) Needless to say, Plaintiff must ground that sort of conspiracy in actual facts to survive summary judgment. For the reasons stated below, the Court concludes that she does not and that summary judgment is appropriate.

### 1. Age Discrimination

The burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs discrimination claims under the ADEA, NYSHRL, and CFEPA. *See Bucalo v. Shelter Island Union Free Sch. Dist*., 691 F.3d 119, 129 (2d Cir. 2012) (ADEA); *McCall v. Genpak, LLC*, No. 13-CV-1947, 2015 WL 5730352, at *11 (S.D.N.Y. Sept. 30, 2015) (NYSHRL); *DeAngelo v. Yellowbook Inc*., 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (CFEPA). "Under the test, a plaintiff must first establish a prima facie case" of discrimination. *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 83 (2d Cir. 2015). Once the plaintiff has done so, "[t]he burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." *Id*. (quoting *McDonnell Douglas*, 411 U.S. at 802). "If such a reason is proffered, the burden shifts back to the plaintiff" to prove that that the employer's reason was a pretext—in other words, "to prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R*., 230 F.3d 34, 38 (2d Cir. 2000).

The Second Circuit has stated repeatedly that "an extra measure of caution is merited before grating . . . summary judgment in a discrimination action because direct evidence of discriminatory intent is rare." *See Moll v. Telesector Res. Grp., Inc*., --- F.4th ---, 2024 WL 820179, at *5 (2d Cir. Feb. 28, 2024) (quotation marks omitted); *see also Banks v. Gen. Motors, LLC*, 81 F.4th 242, 258 (2d Cir. 2023) (noting that the Second Circuit has "repeatedly expressed

14

the need for caution about granting summary judgment to an employer in a discrimination case" especially where the merits "turn on a dispute as to the employer's intent" (quoting *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008)).  Because discriminatory intent is "elusive" in nature, *Vega* 801 F.3d at 86, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination," *Banks*, 81 F.4th at 259 (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).  That said, a plaintiff's "'reliance upon conclusory statements or mere allegations' will not suffice to defeat summary judgment."  *Moll*, 2024 WL 820179, at *5 (quoting *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002)).  Summary judgment remains proper when "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Id*. (quoting *Celotex*, 477 U.S. at 322–23).  As the same approach applies to claims under all three statutes at issue, the Court evaluates the substance of Plaintiff's claims concurrently.

### a.  Prima Facie Case

To establish a prima facie case, a plaintiff must show that "(1) [s]he is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Vega*, 801 F.3d at 83 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000)).  Here, it is undisputed that Plaintiff was over 40-years old and thus a member of a protected class, that she was qualified for a social worker position, and that she was subject to an adverse employment action. (*See* Pl's Mem. 3; Defs' Mem. 9.)   This step of the *McDonnell Douglas* analysis thus turns solely on whether Plaintiff can show a minimal inference of discrimination.

"An inference of discriminatory motivation may be supported directly, such as by statements that an adverse employment action was related to [the] plaintiff's protected class, . . .

or indirectly by a[ showing] that [the] plaintiff was treated different from and less favorably than similarly situated peers." *Roache v. Long Island R.R.*, 487 F. Supp. 3d. 154, 172 (E.D.N.Y. 2020) (first citing *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984); and then *Marquez v. Starrett City Assocs.*, 406 F. Supp. 3d 197, 208–09 (E.D.N.Y. 2017)).  To show disparate treatment, in turn, a plaintiff must demonstrate "that she (1) was similarly situated to other younger employees, and (2) was treated less favorably than those employees." *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 21 (E.D.N.Y. 2015) (citing *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014)).  The similarly situated comparator need not be "identical" to the plaintiff, just "similarly situated in all material respects." *Raspardo*, 770 F.3d at 126 (quoting *Graham*, 230 F.3d at 39).  At the prima facie step of the analysis, "[the] plaintiff also may create a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination." *Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 611–12 (E.D.N.Y. 2017) (quoting *Vega*, 801 F.3d at 87).

The Parties spill significant ink on this step of the analysis.  Plaintiff argues that various pieces of circumstantial evidence support an inference of discrimination.  (Pl's Mem. 3–16.) And Defendants strenuously dispute that any such inference is appropriate.  (Defs' Mem. 8–18.) Despite this chosen battleground, "an increasing number of courts in th[e] [Second] Circuit presume that plaintiffs have sufficiently presented a prima facie case," and examine Defendants' nondiscriminatory reason for termination, considering these arguments at the third step of the *McDonnell Douglas* framework.  *See Hernandez v. Off. of Comm'r of Baseball*, No. 18-CV-9035, 2021 WL 1226499, at *5 (S.D.N.Y. Mar. 31, 2021) (quoting *Ramos v. Piller, Inc.*, No. 07 Civ. 4047, 2009 WL 3401261, at *4 (S.D.N.Y. Oct. 21, 2009)); *see also Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (finding the court "need not reach" a plaintiff's prima

16

facie case "because the [defendant] met its burden to put forth legitimate, nondiscriminatory reasons for [plaintiff's] termination").

This sequence makes sense for two reasons. First, Plaintiff need only make a "minimal" or "de minimis" showing at the prima facie stage. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (quoting *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001)). Second, the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000), "eliminat[ed] the theoretical distinction between a plaintiff's evidence on the prima facie element of an inference of discrimination and his evidence showing pretext." *Hernandez*, 2021 WL 1226499, at *5 (italics omitted) (citing *Gorley v. Metro North Commuter R.R.*, No. 99-CV-3240, 2000 WL 1876909, at *6 (S.D.N.Y. Dec. 22, 2000) (construing *Reeves*, 530 U.S. at 143)). Accordingly, the Court assumes that "[P]laintiff has met [her] minimal burden for the purpose[s] of this [M]otion." *Gorley*, 2000 WL 1876909, at *6.

### b.  Legitimate Non-Discriminatory Justification

The Court takes Plaintiff's prima facie case as a given, so the burden shifts to Defendant to establish a legitimate, non-discriminatory reason for terminating Plaintiff. The employer's burden is one of "production" not persuasion, *Bucalo v. Shelter Island Union Free School District*, 691 F.3d 119, 128 (2d Cir. 2012) (quoting *Hicks*, 509 U.S. at 506–07), and thus "is not a particularly steep hurdle," *Hyek v. Field Support Services, Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010), *aff'd*, 461 F. App'x 59 (2d Cir. 2012) (summary order). That burden, moreover, is readily met where a defendant presents evidence of poor performance. *See, e.g.*, *Kho v. New York & Presbyterian Hosp.*, 344 F. Supp. 3d 705, 718 (S.D.N.Y. 2018) (noting "poor performance" is a legitimate reason for termination); *DeMuth v. United States Small Bus. Admin.*, 819 F. App'x 23, 26 (2d Cir. 2020) (summary order) (similar).

17

Defendants contend that ample evidence supports their decision to terminate Plaintiff based on her performance.  The Court agrees.[10]  Cordovano testified to a variety of problems that Plaintiff had at work, including that she did not take notes for five straight days, (Cordovano Dep. at 133), that she did not properly document family calls, (*id*. at 150, 153), and that she took too long to complete patient assessments, (*id*. at 231).  Balducci, the hospital's nurse manager, likewise testified that Plaintiff had a difficult time interacting with families and "would forget what she was going to ask."  (Balducci Dep. at 24–25.)  Plaintiff's assigned trainer, Reed, pointed out similar issues and stated that Plaintiff had trouble using necessary technology without assistance.  (Reed Dep. at 155.)  More generally, Reed documented trouble training Plaintiff stating that she struggled to "complete . . . paperwork that is critical [to] the social work role" despite being walked through the process and given examples.  (*See* Defs' Mem. Ex. V at 2; *see also id*. (stating Plaintiff was not "grasping the fundamental basics the social worker must be able to complete").)  Those problems led Defendants to issue Plaintiff a written warning, (Cordovano Dep. at 194; *see also* Defs' Mem. Ex. Y), after which Defendants state that her performance failed to improve.  That record is more than sufficient to sustain Defendants'

_____

[10] Plaintiff suggests that the Court should not even consider this step of the burden-shifting framework because Defendants do not present a non-discriminatory justification in their Motion.  (Pl's Mem. 8.)  Although the Motion lacks a heading with that specific title, Defendants clearly present a justification in their papers.  For instance, Defendants state plainly that "Plaintiff's termination was done for the legitimate, nondiscriminatory reason that she failed at her fast-paced job, in which there was small room for error due to its safety implications for an elderly, dementia-stricken patient population."  (Defs' Mem. 16; *see also id*. ("Plaintiff's employment in the SBH Unit ended within her probationary period and after a written caution, as a result of her poor performance and continued and unimproved deficiencies."); Defs' Reply 6 ("Even assuming Plaintiff can establish a prima facie case of discrimination, Plaintiff's age discrimination claim fails because she was terminated for a legitimate, non-discriminatory reason, which was not a pretext for discrimination." (italics omitted)).)  Additionally, Defendants clearly recognize that *McDonnell Douglas* applies and they correctly note that the employer "must only articulate, not prove" their legitimate justification.  (Defs' Mem. 9.)

burden.  *See Hess v. Mid Hudson Valley Staffco LLC*, No. 16-CV-1166, 2018 WL 4168976, at

*12 (S.D.N.Y. Aug. 30, 2018) ("Defendant provided a legitimate, non-discriminatory reason for

terminating Plaintiff: her poor performance, . . . in a concentrated period of time, which

threatened patient safety[.]"), *aff'd*, 776 F. App'x 36 (2d Cir. 2019) (summary order).

<u>c.  Pretext</u>

The burden now shifts back to Plaintiff to "create a dispute of fact regarding whether

Defendant[s'] proffered non-discriminatory reasons for terminating her are pretextual."  *Id*. at

*12.  This analysis "merges with the [P]laintiff's ultimate burden of showing that the

[D]efendant[s] intentionally discriminated against her."  *Littlejohn v. City of New York*, 795 F.3d

297, 307–08 (2d Cir. 2015) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256

(1981).  In other words, Plaintiff must show not only that Defendants' proffered reason is false

(pretext), but also that her age "actually motivated" her termination (causation).  *See Brown v.

City of New York*, No. 10-CV-3104, 2011 WL 6003921, at *7 (S.D.N.Y. Nov. 30, 2011) (internal

quotation marks and citation omitted); *see also Davey v. Jones*, 371 F. App'x 146, 148 (2d Cir.

2010) (summary order) (same).

The second prong of that burden differs among the three statutes at issue.  Under the

NYSHRL, a plaintiff must demonstrate that discrimination was "one of the motivating factors,

even if it was not the *sole* motivating factor" for her unequal treatment.  *Syeed v. Bloomberg

L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (quotation marks omitted and emphasis added)

(quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 40–41 (App. Div. 2012)).  For

ADEA claims, a plaintiff must show that the discriminatory motive "was a but for cause" of the

adverse employment action, as opposed to just a factor in the decision.  *McCormack v. IBM*, 145

F. Supp. 3d 258, 266 (S.D.N.Y. 2015) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173

(2009)).  And there appears to be a significant split among Connecticut courts and among courts

in the Second Circuit about which standard applies to CFEPA claims.  *See Tatum v. Univ. of Hartford*, No. 19-CV-01546, 2021 WL 4224721, at *7 n.3 (D. Conn. Sept. 16, 2021) (noting that the Connecticut Supreme Court has not addressed the question and citing *Vale v. City of New Haven*, 197 F. Supp. 3d 389, 397–400 (D. Conn. 2016) (providing comprehensive overview of split in authority)).  Those differences are not dispositive here, however, as Plaintiff fails to create a dispute of fact under even the lenient "mixed motive" standard.

Plaintiff first seeks to prove pretext by pointing to inconsistencies in Defendants' explanation.  (*See* Pl's Mem. 5–6, 9–10.)  Although varying explanations may create a dispute of material fact, *see Norville v. Staten Island University Hospital*, 196 F.3d 89, 97–98 (2d Cir. 1999), the purported inconsistencies Plaintiff raises do not bear fruit.

As an initial matter, Plaintiff does not meaningfully contest that the *documentary* evidence of her termination *is* consistent.  (*See* Pl's Counter 56.1 ¶ 180.)  Indeed, Cordovano recorded Plaintiff's performance issues and submitted them to HR, (*see* Collyer Decl., Ex. X); Cordovano then issued Plaintiff a written warning "regarding her work performance," (*see id.*, Ex. Y); and she followed up roughly one month later terminating Plaintiff referencing that same warning, (*see id.* Ex. BB).[11]

Plaintiff instead relies on purportedly inconsistent statements in her October 2, 2020, termination meeting.  (Pl's Mem. 5, 9.)  Specifically, she states that Cordovano discussed a possible "HIPAA violation" during the meeting and suggests that violation, rather than her

---

[11] Plaintiff argues that one of Cordovano's emails stating "[Plaintiff] is not working out" is inconsistent with this explanation.  (Pl's Mem. 9. (citing Collyer Decl., Ex. W).)  The email's context—an exchange between Cordovano and Savino about Plaintiff's performance issues—strongly suggests that this language is work-related.  (*See* Collyer Decl., Ex. W.)  To the extent Plaintiff means to suggest (and the Court seriously doubts that she does) that Cordovano meant "working out" in the physical activity sense, there is nothing in the record to support that interpretation.

performance, was the reason for her termination.  (*Id.* at 9; *see also* Osinoff Dep. 156–57.)  For context, the possible violation appears to relate to a report drafted by Reed on October 1, 2020, where she raised concerns about Plaintiff taking private patient calls from her office.  (*See* Goddard Decl., Ex. 16 ("Reed Written Report") (Dkt. No. 74-16).)  Cordovano also recalled discussing a HIPAA issue at the meeting but stated that it had "nothing to do with [Plaintiff's] termination."  (Cordovano Dep. 223–24.)  Plaintiff, in an attempt to reinforce any discrepancy, notes that Cordovano could not remember to whom she reported the HIPAA issue.  (Pl's Mem. 10 (citing Cordovano Dep. at 224).)

Even construed in Plaintiff's favor, this testimony does not establish a dispute of fact as to pretext.  At most, the testimony establishes that Cordovano discussed a potential HIPAA violation during the termination meeting.  But Plaintiff does not make—and Cordovano expressly disclaims—the suggestion that the HIPAA violation was the reason for Plaintiff's termination.  (*See* Osinoff Dep. 158–59 (agreeing that Defendants' written communications do not mention HIPAA).)  Even if the possible violation played a role, however, it is entirely consistent with Defendants' performance-based rationale.

Plaintiff also briefly argues that she "did not show incompetence" in the short lead-up to her termination.  (Pl's Mem. 5–6.)  For support Plaintiff points to testimony from Zurzola that Plaintiff provided helpful advice about speaking to families, (Pl's Mem. 6 (citing Zurzola Dep. at 140–43)), and to testimony from Cordovano that Plaintiff "did a decent job" in group settings and that she "didn't do a bad job on" the psychological assessments that she wrote, (*id.* (citing Cordovano Dep. 93–94)).[12]  But here, too, the statements Plaintiff points to are consistent with

_____

[12] Plaintiff also cites statements from Dr. Mubbashar, the supervising physician.  Dr. Mubbashar agreed that it "would be too early to make a determination in two weeks whether a social worker was not going to work out unless they made some glaring error."  (Goddard Decl.,

Defendants' rationale for termination.  Indeed, Defendants' overriding concern was that Plaintiff did not complete required tasks consistently or efficiently, not that she did a poor job on the work product she turned in.  *See supra* II.B.1.b.  Put another way, that Plaintiff performed some tasks satisfactorily does not mean that her performance, taken as a whole, was satisfactory.

Even assuming Defendants' justification is pretextual, Plaintiff fails to create a dispute of fact about whether it was "a pretext *for a prohibited reason*."  *Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258, 2018 WL 4636835, at *7 (S.D.N.Y. Sept. 27, 2018) (emphasis added and internal quotation marks omitted) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  Plaintiff presents various types of circumstantial evidence, which the Court considers in turn.

First, Plaintiff recalls a conversation between herself, Cordovano, Balducci, and Zurzola about Cordovano's exercise routine.  (*See* Pl's Mem. 3.)  According to Plaintiff, she and the two other employees were seated in the same room, and Cordovano opened up a folding chair in the middle of the group.  (Osinoff Dep. at 150–51.)  Cordovano then explained her workout routine, "said it was not bad for someone" her age, and then "immediately looked at other people demanding to know what their ages were."  (Compl. ¶ 42; *see also* Osinoff Dep. at 148–49.)  The other employees revealed their ages, and when Cordovano reached her, Plaintiff stated her age because she felt pressured to do so.  (Compl. ¶ 42.)  Plaintiff recognizes that Cordovano did not expressly talk about, or ask, what Plaintiff's age was, (Osinoff Dep. 150–51), but nevertheless

---

Ex. 12 ("Mubbashar Dep.") at 225 (Dkt. No. 74-12).)  But he also testified that five weeks—the approximate period between Plaintiff's start date and her termination—would be a "fairly reasonable" period in which to make such a judgment.  (*Id*.)  And importantly, Dr. Mubbashar disclaimed this testimony by noting that he "d[id] not supervise social worker[s] and that [he was] not a social worker."  (*Id*. at 227.)  The Court does not find this testimony to be probative of Defendants' reasoning.

states that the conversation made her feel humiliated, (*id*. at 153, Compl. ¶ 42).[13]  Moreover,

when Plaintiff ultimately did reveal her age, Cordovano "abruptly stood up" and proceeded to

leave the room.  (Compl. ¶ 42.)

Despite these circumstances, and their effect on Plaintiff, Cordovano's comment belongs

to a class of statements akin to "stray remarks" which, without more, "do not constitute sufficient

evidence to make out a case of discrimination."  *Parron v. Herbert*, No. 17-CV-3848, 2018 WL

2538221, at *9 (S.D.N.Y. May 18, 2018) (internal quotation marks omitted) (quoting *Danzer v.*

*Norden Sys., Inc*., 151 F.3d 50, 56 (2d Cir. 1996)).  Plaintiff does not suggest, for instance, that

"there is a close nexus" between the workout comment and her termination.  *See Martin v. State*

*Univ. of New York*, 704 F. Supp. 2d 202, 224 (E.D.N.Y. 2010) (explaining that "the more remote

and oblique the remarks are in relation to the . . . adverse action, the less they prove that the

action was motivated by discrimination" (internal quotation marks and citation omitted)).  Nor

does she even explain how the two subjects are related.  Without that connective tissue, there is

an insufficient basis to conclude this comment is indicative of improper animus.  *See Hamilton v.*

*Mount Sinai Hosp.*, 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007) (collecting cases holding that

"even direct references to a plaintiff's age are not necessarily indicative of discrimination").

That remains true even though Plaintiff felt humiliated by the context of the conversation and by

Cordovano's reaction.  Her "embarrassment does not constitute age discrimination" absent

"evidence supporting [her] subjective view that [D]efendants intended to discriminate [] on the

---

[13] Defendants note in reply that neither Balducci nor Zurzola recall this conversation.
(*See* Defs' Reply 1; Decl. of Adam. E. Collyer ("Collyer Supp. Decl."), Ex. DD at 195–96; Ex.
CC at 31.)  At most, that testimony establishes a dispute as to whether the conversation occurred
which the Court must view in the light most favorable to Plaintiff at this stage.  *See Scott v.*
*Harris*, 550 U.S. 372, 380 (2007).

basis of age." *Molin v. Permafiber Corp.*, No. 01-CV-9279, 2002 WL 31760215, at *7 (S.D.N.Y. Dec. 9, 2002); *see also Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 461 (S.D.N.Y. Mar. 29, 2023) ("[S]ubjective feelings of anxiety or embarrassment are insufficient to constitute an adverse employment action." (internal quotation marks and citation omitted)).

Second, Plaintiff points to various purported disparities between the training that she and Zurzola, another recent hire, each received. (Pl's Mem. 10–13.)[14] Although it is not discussed by the Parties, the Court assumes that Plaintiff and Zurzola are similarly situated. Indeed, they started social worker jobs in the Sharon Hospital SBH unit on consecutive days, (Def's 56.1 ¶¶ 7–8, Pl's 56.1 ¶¶ 7–8), and they both reported directly to Cordovano, (*Id.* ¶ 9; *id.* ¶ 9). And, relevant here, they were both assigned to train with more senior employees. (*Id.* ¶¶ 67–68; *id.* ¶¶ 67–68.) The Court can draw from those facts the minimal inference that Plaintiff and Zurzola share "sufficient employment characteristics" for the purposes of this analysis. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001); *see also Ehrbar*, 131 F. Supp. 3d at 21 (noting that the employees' "positions" and the company's "reporting structures" are relevant to the similarly situated analysis). Finally, it is undisputed that Zurzola was not a member of the protected class. (*See* Pl's Mem. 3; *see generally* Defs' Reply).)

Plaintiff states that her trainer, Reed, did not take time to talk through anything with Plaintiff, did not "work though an electronic application or procedure," or "talk through how to present cases" in "morning rounds." (Osinoff Decl. ¶ 6.) Plaintiff also states that Reed was busy

---

[14] Although inadequate training may itself constitute an adverse employment action, *see Trachtenberg v. Department of Education*, 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013), Plaintiff does not raise a separate claim on this basis.

with a heavy caseload at the time.  (Osinoff Dep. 128.)  And according to Plaintiff, Reed did not

conduct a family call with plaintiff "in a meaningful way" and at most would listen to calls from

her (Reed's) desk while Plaintiff conducted the call on her own.  (Osinoff Decl. ¶ 6.)  By

contrast, Zurzola's trainer, Coletti, appeared to have a more hands-on training style.  Coletti

would discuss emails she received from other facilities, (Zurzola Dep. 50), talk through proposed

responses to questions, (*id*. at 51), and allow Zurzola to listen to family calls and voicemails, (*id*.

at 54).

      Although a reasonable jury could find a disparity in training, that disparity is not

especially probative of discrimination.  Typically, ADEA discrimination claims based on

training involve situations where the employer "deliberately den[ied] [an employee] the training

necessary to perform satisfactorily," *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 250 (2d Cir.

2005); *see also Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 522 (S.D.N.Y. 2004) (similar).

Put differently, those cases involve allegations or evidence that substandard training played a

role in an employee's termination.  Plaintiff's claim does not fit that mold, however.[15]  It is

undisputed that she and her younger counterpart both received training.  Yet, despite disparities

in that training, Plaintiff repeatedly argues that her performance was satisfactory and that any

evidence to the contrary was simply "fabricat[ed]."  (Pl's Mem. 10, 13–16.)[16]  Plaintiff is correct,

---

[15] Plaintiff does not argue, for instance, that she was dismissed *because of* subpar training, or that any disparity in training caused her to perform poorly.  (*See generally* Pl's Mem.)  Indeed, she expressly argues that her performance, in spite of the allegedly subpar training, was satisfactory and was not a legitimate basis for her termination.  (Pl's Mem. 5–6.)

[16] To be clear, Plaintiff's references to "fabricating" evidence are conclusory and have no basis in the record.  The Court cites this language to reinforce Plaintiff's position that she, in fact, performed adequately.  *See S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (stating that "assertions that are based on speculation or are conclusory" do not "show the existence of a genuine issue of fact").

of course, that disparate treatment, alone, may give rise to an *inference* of discrimination.  But

that inference "'drops out of the picture' once the defendant meets its burden of production."

*Reeves*, 530 U.S. at 143 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

Plaintiff does not provide additional evidence at this stage that either (a) her training assignment

was motivated by her age, or (b) that her training somehow factored into her termination.[17]

Third, Plaintiff argues that the timing of her termination is a circumstance that supports

an inference of discrimination.  (Pl's Mem. 4–5.)  She notes that only thirteen days elapsed

between her start date and the date that Cordovano emailed Koppe (the HR coordinator) about

her performance.  (Pl's Mem. 4; Collyer Decl., Ex. W (displaying emails between Cordovano

and Koppe).)  Citing to caselaw in the retaliation context, Plaintiff contends that this short

timeframe establishes a close relationship between "Cordovano learning of Plaintiff's age" and

the "beginning of her termination."  (Pl's Mem. 4. (citing *Gorman-Bakos v. Cornell Co-op*

*Extension of Schenectady Cnty.*, 252 F.3d 545 (2d Cir. 2001)).[18]

---

[17] The only material Plaintiff provides on this score is a paragraph in her Rule 56.1 statement that "[a] jury can conclude that Cordovano's testimony on this [training] point is wholly self-serving and that she paired Plaintiff with Reed because she regretted hiring a 59-year-old woman and wanted to assign her to Reed who she knew was a wholly unsympathetic . . . trainer."  (Pl's Resp. 56.1 ¶ 67.)  This statement, and others like it, that "are not based on personal knowledge," and that "are conclusory or argumentative," are neither admissible nor appropriate to consider at summary judgment.  *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).  As such, once this statement is removed from the evidentiary equation, it is clear that Plaintiff has no evidence that the training regimen was itself the product of discrimination.

[18] The Parties dispute when Cordovano actually learned of Plaintiff's age.  (*See* Pl's Mem. 4–5.)  However, it is undisputed that Cordovano received an email with Plaintiff's resume attached on June 24, 2020.  (*See* Pl's 56.1 ¶ 2; Collyer Decl., Ex. A)  Also undisputed is that Plaintiff's resume states that she had more than 20 years of experience, and that Cordovano interviewed Plaintiff over the phone.  (*Id*. ¶¶ 3, 4; Cordovano Dep. 107.)  A reasonable juror could easily conclude that Cordovano knew Plaintiff was, at the very least, older than 40, even if Cordovano did not know *exactly* how old Plaintiff was until her start date.

This point, too, fails to create a genuine dispute of fact as to discriminatory intent.  For starters, the record does not support Plaintiff's timeline.  (*See* Defs' Reply 2.)  To support the claim that Cordovano "initiated Plaintiff's termination" after thirteen days, Plaintiff cites to emails between Cordovano and Koppe.  (Pl's Mem. 4 (citing Collyer Decl. Ex. W).)  In that conversation, however, Cordovano simply requests to "speak with" Koppe about Plaintiff's performance, she makes no mention of termination, or related procedures.  (Collyer Decl. Ex. W.)  Additionally, Koppe testified that this sort of initial discussion corresponded to the first step of Defendants' progressive discipline policy, of which termination was the fourth and final step. (Koppe Dep. 33.)  It is not reasonable to surmise that this conversation, which predated Plaintiff's written warning, was actually a premature decision to terminate her.

Even if Plaintiff's view of the record is correct, a quick termination helps Defendants' stated justification at least as much as it hurts.  Where, as here, "the person who made the decision to fire was the same person who made the decision to hire," and "the fire has occurred only a short time after the hiring" it is "especially" difficult "to impute to her an invidious motivation."  *Chen v. Stony Brook Univ. Advancement*, No. 20-4250, 2022 WL 289317, at *2 (2d Cir. Feb. 1, 2022) (summary order) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (finding eight-day period between hiring and firing was a factor that "strongly suggest[ed] that invidious discrimination was unlikely")); *Nassry v. St. Luke's Roosevelt Hosp.*, No. 13-CV-4719, 2016 WL 1274576, at *8 (S.D.N.Y. Mar. 31, 2016) (same).[19]  Logically, it is

---

[19] The Parties do not dispute that Cordovano played, at minimum, "a substantial role in both the hiring and firing of [] [P]laintiff," which is required for the same-actor inference to apply.  *See Nassry*, 2016 WL 1274576, at *8 (quotation marks omitted) (quoting *Penn v. New York Methodist Hosp.*, No. 11-cv-9137, 2013 WL 5477600, at *14 (S.D.N.Y. Sept. 30, 2013)). (*See also* Pl's 56.1 ¶ 167 ("It is undisputed that Defendant Cordovano hired Plaintiff after one or two phone calls . . . ."); Defs' Mem. 10; Defs' Reply 4; Koppe Dep. 36–37.)  That holds true even if Cordovano was not the "*sole* individual involved" in those decisions; a single person

hard to imagine that an organization, or an individual, that expresses favorable treatment to an employee via a job offer would reverse course in less than two weeks without a compelling justification.

Plaintiff suggests that any such inference does not apply because Cordovano was not aware of Plaintiff's age.  (Pl's Mem. 7.)  Indeed, the inference generally does not apply in cases where "there is no record evidence that Defendants" knew of the protected characteristic.  *See de Souza v. Planned Parenthood Fed'n of Am., Inc.*, No. 21-CV-5553, 2023 WL 2691458, at *9 (S.D.N.Y. Mar. 29, 2023); *see also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 329 n.6 (S.D.N.Y. 2020) ("The same-actor doctrine has no bearing on Farmer's pregnancy discrimination claims, because, on the facts pled, Cordova was unaware at the time he hired Farmer that she was pregnant.").  Viewed in Plaintiff's favor, Cordovano did not know Plaintiff's exact age, but probably had some idea that she was over-40 given her two decades of work experience.  (*See* Pl's Mem. 7.)  For that reason, the Court does not view the same-actor inference as a factor weighting against pretext.  Instead, it analogizes to this caselaw to demonstrate why the timing of Plaintiff's termination, alone, is not particularly probative of discrimination.

Just as Plaintiff's pieces of evidence do not give rise to a dispute of fact, considered alone, they also fail to do so together.  The thread connecting those pieces is Plaintiff's *belief* that Cordovano had it out for Plaintiff from the moment the two met in person.  But the only "evidence" cited to support *that* theory is Plaintiff's own "self-serving statement[s]" which are

---

rarely is.  (*See* Pl's Mem. 7 (emphasis added).)  *See also Dorcely v. Wyandach Union Free Sch. Dist.*, 665 F. Supp. 2d 178, 198 (E.D.N.Y. 2009) (stating same-actor inference "is applicable so long as one management-level employee" played a significant role in both decisions (internal quotation marks and citation omitted)).

"insufficient to defeat a motion for summary judgment." *See Adler v. Penn Credit Corp.*, No.

19-CV-7084, 2022 WL 744031, at *9 (S.D.N.Y. Mar. 11, 2022) (quotation marks omitted)

(quoting *Wheeler v. Kolek*, No. 16-CV-7441, 2020 WL 6726947, at *8 (S.D.N.Y. Nov. 16,

2020)); *see also Hawkins v. N.Y. State Office of Mental Health*, No. 17-CV-649, 2019 WL

4520801, at *12 (S.D.N.Y. Sept. 19, 2019) (collecting cases and concluding that the "[p]laintiff's

own self-serving statements, in her affidavits, memoranda, and deposition," were insufficient to

survive the defendants' summary judgment motion because the statements were "all self-serving

statements uncorroborated by any additional evidence"), *aff'd*, 845 F. App'x 9 (2d Cir. 2021)

(summary order).  For the same reason, Plaintiff's testimony is unable to overcome "undisputed

evidence" outlining Defendants' non-discriminatory justification for her termination.  *See*

*Cestaro v. Prohaska*, — F. Supp. 3d —, 2023 WL 4425737, at *2 (S.D.N.Y. July 7, 2023)

("[C]ontradiction of undisputed evidence in a self-serving affidavit, unsupported by other

evidence, is not by itself sufficient to create a genuine dispute of material fact.").[20]

Accordingly, Plaintiff has failed to present "evidence that would permit a rational

factfinder to infer that the discharge was actually motivated, in whole or in part, by

discrimination on the basis of age." *See Grady*, 130 F.3d at 561.

---

[20] Plaintiff also cites portions of witness testimony suggesting that Nuvance does not provide "specific training as to anti-discrimination" to all of its employees.  (*See* Pl's Mem. 3.) The import of this testimony is not entirely clear.  On the one hand, Defendants may be insensitive to signs of potential discrimination.  On the other hand, Plaintiff would have a much stronger intent argument if Defendants *did* provide such training but discriminated anyway.  *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 309 (S.D.N.Y. 2008) (citing *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 385 (2d Cir. 2001) (finding that supervisor's training in equal employment opportunity permitted the jury to infer the requisite state of mind)).

### 2.  Hostile Work Environment

The same standard governs Plaintiff's hostile work environment claims under the ADEA and CFEPA.  To prevail, she must demonstrate a dispute of fact about whether her workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Zoulas v. New York City Dep't of Educ.*, 400 F. Supp. 3d 25, 59 (S.D.N.Y. 2019) (quotation marks omitted) (quoting *Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019)) (stating standard for ADEA hostile work environment claim); *Martin v. Town of Westport*, 558 F. Supp. 2d 228, 242 (D. Conn. 2008) (applying same standard to CFEPA hostile environment claim).

The discriminatory conduct must be both objectively and subjectively severe in that "a reasonable person would find," and Plaintiff herself actually perceived, the environment to be "hostile or abusive." *Pratt v. Brennan*, No. 18-CV-4799, 2020 WL 364195, at *4 (S.D.N.Y. Jan. 22, 2020) (quotation marks omitted) (quoting *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007)).  In this context, "the actions taken by the defendant 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)).  Accordingly, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  The Second Circuit "treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009).  Finally, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Richards v. N.Y.C.*

30

*Dep't of Educ.*, No. 13-CV-16, 2015 WL 4164746, at *10 (S.D.N.Y. July 10, 2015) (citations and quotation marks omitted).

Plaintiff spends little time on this claim and her proffered evidence cannot defeat summary judgment. She appears to cite only a single, purportedly hostile, age-related incident in the relevant portion of her brief: Cordovano's workout conversation.[21]  (Pl's Mem. 19–20.) Although she testified that the episode made her feel "humiliated," (Osinoff Dep. 153), she does not put forward evidence of a "series of incidents [that] were sufficiently continuous and concerted to have altered the conditions of her working environment." *See Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000). "While it is true that a single incident can be enough to support a hostile work environment claim, such an incident must be extraordinarily severe, and no reasonable jury could reach such a conclusion here." *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 487 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

To the extent Cordovano or others did engage in hostile or abusive conduct, that conduct was not traceable to Plaintiff's age. Plaintiff testified to various interactions with Cordovano and Reed that may be characterized as "rude," but those incidents, without more, "reflect[] only fraught relationships with her supervisors." *See Williams v. Geiger*, 447 F. Supp. 3d 68, 81 (S.D.N.Y. 2020) (quoting *Harvin v. Manhattan & Bronx Surface Transit Operating Auth.*, 767 F. App'x 123, 128 (2d Cir. 2019) (summary order)). In fact, the record also contains useful testimony for Defendants that Cordovano repeatedly "interject[ed]" and "disrespected" Zurzola, Plaintiff's younger counterpart. (*See* Zurzola Dep. 171–72.) Zurzola also testified that Dr.

---

[21] Plaintiff discusses her training and termination in the same section of her brief, largely retreading her discrimination arguments. (*See* Pl's Mem. 19–20.) However, she does not argue that either aspect of her experience was objectively or subjectively "hostile." *See Pratt*, 2020 WL 364195, at *4. A hostile work environment claim, moreover, "is distinct from discrete acts of discrimination." *Id.*

Mubbashar frequently yelled at everyone on the SBH Unit, that Zurzola cried multiple times as a result, and that she observed other social workers crying as well.  (*See id*.)  That testimony, which Plaintiff does not cite but also does not dispute, (*see* Pl's 56.1 ¶¶ 63–64), points towards objective hostility and certainly paints a grim workplace picture but does not allow a rational factfinder to conclude that any of that hostile conduct was linked to Plaintiff's age.  *See Brennan v. Metro. Opera Ass'n, Inc*., 192 F.3d 310, 318 (2d Cir. 1999) ("In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes.").

For similar reasons, Plaintiff also cannot defeat summary judgment on her NYSHRL work environment claim.  The NYSHRL standard is similar to the one applied above but requires only that Plaintiff be "subjected to inferior terms, conditions, or privileges of employment because of the individual's membership in one or more protected categories."  *Alvarado v. United Hospice, Inc*., 631 F. Supp. 3d 89, 119 n.16 (S.D.N.Y. 2022) (quotation marks and citation omitted) (explaining that 2019 amendments to the NYSHRL "eliminated the 'severe and pervasive standard'"); *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *13 (S.D.N.Y. Sept. 14, 2021) (same).  Nevertheless, the "ultimate issue [remains] the reasons for *the individual plaintiff's treatment*."  *Id.* at 120 (quoting *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001)).  As the Court has explained in detail, no rational factfinder could conclude that Plaintiff was subjected to an inferior work environment because of her age.

### III.  Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted.  The Clerk is respectfully directed to terminate the pending motion (Dkt. No. 61), enter judgment for Defendants, and close this case.

SO ORDERED.

Dated:   March 5, 2024
         White Plains, New York

                                           KENNETH M. KARAS
                                   United States District Judge